## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 2:15-cr-008 |
| | ) |
| RODNEY HOWARD, | ) Judge Mark R. Hornak |
| | ) |
| Defendant | ) |

## OPINION

**Mark R. Hornak, United States District Judge,**

Pending before the Court is the Defendant's Motion to Suppress Statements and Physical Evidence, ECF No. 19. Having reviewed Mr. Howard's Motion along with all filings in support and in opposition thereto, ECF Nos. 22; 30; 49; 51; 55, and having held an evidentiary hearing and oral argument on the Motion on June 11, 2015, the Court denies the Motion for the reasons set forth in this Opinion.

## I. BACKGROUND

On September 18, 2014, members of the Western Pennsylvania Fugitive Task Force ("Task Force") arrested Mr. Rodney Howard ("Mr. Howard" or "Defendant") pursuant to an arrest warrant at 5131 Clairton Boulevard ("the Residence") located in Baldwin Borough, a suburb of Pittsburgh. While conducting a "protective sweep" of the Residence after arresting Mr. Howard, the Task Force saw in plain view a great deal of heroin and drug paraphernalia. Law enforcement officers then obtained a search warrant for the Residence and upon executing it, found over 4,700 bags of heroin, amounting to approximately 132 grams, as well as drug packaging and manufacturing paraphernalia.

Mr. Howard was indicted on January 20, 2015, and charged with one count of possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i). ECF No. 1.

Mr. Howard moved to suppress physical evidence (the seized drugs and drug paraphernalia) and statements he made at the scene. ECF No. 19. The Court held an evidentiary hearing on the suppression issue on June 11, 2015. Testifying at the evidentiary hearing for the United States were Deputy U.S. Marshal Jeremy Delano, City of Pittsburgh Police Detective Joseph Lewis, Pennsylvania Board of Probation and Parole Agent Jeffrey Long, Supervisory Deputy U.S. Marshal Jon Gallagher, and City of Pittsburgh Police Detective Dale Ford. The Defendant called Richard Dwyer, a former member of the Task Force who participated in making the arrest as a witness, and Mr. Howard also testified himself. The Court also received supplemental post-hearing briefs from the parties. ECF Nos. 49; 51; 55.

## II. FACTUAL FINDINGS

The Court finds that each of the facts as set forth below was testified to credibly and consistently during the evidentiary hearing, based on the Court's observations of the demeanor of the witnesses and its consideration of their testimony in the context of the evidentiary record. The Court will identify any factual disputes that become relevant to the analysis, and its resolution of them.

Deputy Marshal Delano is a case agent who began searching for the Defendant on January 22, 2014 based on a state arrest warrant issued for criminal homicide. Hr'g Tr. at 17:4-10. Deputy Marshal Delano had access to a "criminal history rap sheet" as part of his investigation, which listed various offenses associated with the Defendant. Based on that, Deputy Marshal Delano considered Mr. Howard "armed and dangerous." *Id.* at 17:20–25, 19:19–21; *see*

Gov.'s Ex. 1. Deputy Marshal Delano also knew that the weapon from the homicide for which the arrest warrant issued was an assault rifle which "was never located" and thus "could still be in Rodney Howard's possession." *Id.* at 32:17–33:2. In the months leading up to Mr. Howard's arrest, Deputy Marshal Delano and the Task Force attempted to apprehend him at several different locations, each time to no avail. *Id.* at 20:18–21:9.

On September 15, 2014, Deputy Marshal Delano directly received information from a "confidential source" that Mr. Howard was associated with the Residence and that the source had purchased drugs at the Residence. *Id.* at 21:19–22:15, 23:3–8. Deputy Marshal Delano was not present for the Defendant's arrest on September 18, 2014, but he passed along that information to others on the Task Force. *Id.* at 23:23–24:4, 34:24–35:2; 42:14–17. Deputy Marshal Delano personally surveilled the Residence on September 15 and September 16, and also knew and passed along to the rest of the Task Force information that a woman named Cheyanne Arrington was associated with Mr. Howard. *Id.* at 29:7–12; 29:19–30:11. Deputy Marshal Delano knew that various surveillance units had "observe[d] . . . numerous individuals going to the house during the surveillance," and he personally "observed a person walking around on the second floor of the [R]esidence." *Id.* at 30:23–31:2.

City of Pittsburgh Police Detective Joseph Lewis conducted surveillance on the Residence for the two days leading up to the Defendant's arrest, though he also was not present at the arrest. *Id.* at 47:23–48:25, 70:1–3. On September 16, 2014, Detective Lewis observed Ms. Arrington exit the Residence, walk to the back of it, and stop to have an exchange with someone located on the second floor through a window. *Id.* at 54:6–56:11. Detective Lewis could not identify the person in the window because that person "was concealed behind the window frame," but saw that person's hand as an object dropped from the window to Ms. Arrington, who

3

then continued walking. *Id.* at 55:5–11, 56:2–4. Detective Lewis believed that other of Ms. Arrington's activity was consistent with drug sales, though that was not his purpose in conducting surveillance. *Id.* at 61:8–62:16. He observed at least "two individuals" entering and exiting the Residence, including Ms. Arrington, during his surveillance, and testified that the hand he saw in the window appeared to belong to an African American male. *Id.* at 64:10–19. On September 17, 2014, Detective Lewis observed "an African American male with a ponytail" enter and exit the Residence, and saw that person "stopped at the exact same window" that Ms. Arrington did before continuing to the front door. *Id.* at 66:6–15. He also observed "a male that pulled up in an SUV" enter the Residence. *Id.* at 67:6–14. The male with the ponytail and the male from the SUV left the Residence together, and the man with the ponytail returned afterward. *Id.* at 68:9–15, 68:19–23. Detective Lewis reported his observations to others on the Task Force. *Id.* at 69:22–25. On cross examination, Detective Lewis admitted that he did not include that someone had been "concealed" in his report, nor did he note "the exchange of the unidentified black male with the ponytail and someone in the residence." *Id.* at 73:15–18, 74:18–23.

Probation Agent Jeffrey Long was among the Task Force members who apprehended the Defendant on September 18, 2014. Agent Long testified that when the Task Force arrived at the Residence and knocked on its front door and announced their presence, he "heard a lot of movement" coming from the second floor. *Id.* at 95:21. While the Task Force "continued to knock/pound on the door," Agent Long observed Mr. Howard "from the second floor window," saying that he (Mr. Howard) would come out and that he was "an innocent man." *Id.* at 96:4–6. Agent Long recognized the man he observed in the window as the Defendant based on a "photograph that was handed out." *Id.* at 96:20–22. Agent Long also knew, prior to entering the

4

Residence, about the Defendant's criminal history, the nature of the underlying charge, the fact that the involved weapon had not been recovered, and that there had been "a lot of activity in and out of the house." *Id.* at 115:8–25.

After Mr. Howard's appearance in the window, the movements inside continued and no one answered the door. *Id.* at 97:1–9. After some thirty to fifty seconds of waiting for someone to come to the door and continuing to hear movements inside, the Task Force Supervisor decided to breach the door, and the Task Force members entered the Residence. *Id.* at 97:10–18. Agent Long described the scene leading up to the second floor as containing "floating steps" that "wrapped to the right," *id.* at 97:24–98:4, and explained that "[t]actically speaking, I cannot envision anything worse" than what was encountered from an officer safety standpoint for various reasons, *id.* at 100:21–101:13 (testimony explaining that the floating staircase wrapped around in such a way that made it tactically difficult both because officers were in a low, "disadvantaged position" as opposed to higher ground, and because the turn was problematic for the right handed agents to hold a weapon and climb the stairs); *see also* Gov.'s Exs. 4A; 4B.[1] Because of that physical setup, the Task Force decided not to press forward but to instead verbally encourage Mr. Howard to come down from the second floor; the Defendant complied with the commands and peacefully surrendered. *Id.* at 102:14–104:4. Agent Long testified that after Mr. Howard surrendered on the lower portion of the steps where Agent Long and another Task Force member stood, Mr. Howard was "passed backwards to be handcuffed by other members of the team" and Agent Long's attention remained forward because there were potentially other people upstairs. *Id.* at 103:23–104:1, 104:7–20. The same oral command and

---

[1] Agent Long elaborated on the tactical problems with retreating before performing a protective sweep of the second floor. *See* Hr'g Tr. at 107:16–108:23 (testimony that turning from the unsecured second floor landing would put the Task Force in a tactically-disadvantaged position since higher ground is easier to defend, that there would be no way to know if people were standing behind windows ready to fire when they exited the Residence, and that it would be difficult to return fire from such an assault, especially if it occurred using the unrecovered assault rifle).

5

peaceful surrender process was repeated with Ms. Arrington, though again, Agent Long's attention remained forward because "we were unsure as to how many people were inside that apartment or who else was remaining upstairs." *Id.* at 104:23–105:18.

After passing Ms. Arrington back to be handcuffed, Agent Long and another Task Force member "took a second to gather [them]selves" and then "conducted a protective sweep of the second floor apartment" because the movements previously heard "sounded as if there was more than two [persons in the apartment] at that point in time." *Id.* at 105:24–106:1, 107:2–5. Agent Long also confirmed that the Task Force had been given information that more than two people had entered and exited the Residence in the past few days. *Id.* at 107:8–12. As Agent Long performed the protective sweep of the second floor, he only looked in places where an adult could hide and while doing so, he saw "a lot of stamp bags and paraphernalia on the counter" in the kitchen. *Id.* at 110:17–111:2.

Deputy Marshal Jon Gallagher was the supervisor of the Task Force and was also present at Mr. Howard's arrest. Deputy Marshal Gallagher also testified about the factors at the scene which caused concern from an officer safety standpoint. *Id.* at 153:4–8. He also explained that "all the briefings [like the one provided before the Task Force arrived at the Residence] include a photograph of the actor, . . . criminal history, information about the target address, others possibly at the target address, [and] any suspected criminal activity at the target address." *Id.* at 150:3–11. Deputy Marshal Gallagher was positioned toward the rear of the Task Force group when they entered the Residence, and testified that Mr. Howard was "handcuffed at the base of the steps and he was detained on the front porch," as was Ms. Arrington. *Id.* at 155:4–5, 155:11–12. Deputy Marshal Gallagher testified that neither Mr. Howard nor Ms. Arrington answered the question of whether anyone else was present in the apartment, *id.* at 155:13–20. But even if it

6

was "totally silent" from above and if both Mr. Howard and Ms. Arrington said there was no one else in the apartment, according to Deputy Marshal Gallagher the Task Force would have nevertheless conducted a protective sweep based on the other factors at issue that day, *id.* at 160:5–20.

Pittsburgh Police Detective Dale Ford testified that he took photographs of the drugs and paraphernalia found in the Residence when a search warrant issued several hours after Mr. Howard's arrest. Detective Ford confirmed that he waited to enter the Residence and take the photos until after the search warrant was obtained and executed. *Id.* at 164:14–21.

The Defendant called Richard Dwyer to testify. Dwyer was a former member of the Task Force who participated in making the arrest on September 18, 2014. Mr. Dwyer largely reiterated the testimony of the other law enforcement officers.[2]

Mr. Howard focused his testimony on explaining that the delay in opening the door and the sounds the Task Force heard from above were due to the fact that he had been in the shower when they arrived and ran around getting dressed when he heard them knocking. *Id.* at 205:18–206:19. Mr. Howard also testified that he was handcuffed "not in the foyer, but on the front porch." *Id.* at 206:24–207:1. He testified that he was not read his rights after being handcuffed, but officers continued to ask him questions about who else was in the house and where the gun was. *Id.* at 207:2–21. Mr. Howard testified that when he said, "I don't have a gun; I never owned a gun," one of the officers responded, stating that "we're going up there and we're going to find the gun." *Id.* at 207:18–21.

---

[2] He also testified about his understanding that the protective sweep was done as part of a standard operating procedure. Hr'g Tr. at 181:13–15, 187:6–188:20.

## III.  ANALYSIS

The Court must determine whether the drugs seized and statements made by Mr. Howard at the Residence must be suppressed. Mr. Howard says that the answer to both questions is "yes" on either of two different grounds. First, Mr. Howard contends that the Task Force members' initial entry into the residence was unlawful because they lacked probable cause to believe that Mr. Howard lived in the Residence. Second Mr. Howard argues the "sweeping" officers lacked specific and articulable facts that would warrant the belief that the Residence harbored an individual posing a danger to law enforcement after he and Ms. Arrington had been arrested and secured. ECF No. 19, at 4–5. Mr. Howard also moved to suppress the statements he made at the Residence under the "fruit of the poisonous tree" doctrine. Hr'g Tr. at 11:4–7.

### A. Whether Entry into the Residence was Lawful

Mr. Howard contends that because the Residence was not his home but rather the home of a third party, Cheyanne Arrington, the Task Force unlawfully entered the Residence to execute the arrest warrant against him. ECF No. 19, at 6–7. The Defendant relies on *Steagald v. United States*, 451 U.S. 204 (1981), which held that police violated the Fourth Amendment when they relied on an arrest warrant to enter the residence of a person unnamed in the warrant on the basis that the named person might be a guest there, *id.* at 214. However, the holding in *Steagald* would apply only if *Ms. Arrington* or the homeowner were the one challenging the entry. *See United States v. Agnew*, 407 F.3d 193, 196–97 (3d. Cir 2005) (citing *United States v. Underwood*, 717 F.2d 482, 484 (9th Cir. 1983) (en banc); *United States v. Kaylor*, 877 F.2d 658, 663 n.5 (8th Cir. 1989)) (holding the right recognized in *Steagald* "is personal to the homeowner and cannot be asserted vicariously by the person named in the arrest warrant").

8

The United States responds that "there was ample evidence to support the conclusion that the defendant resided at 5131 Clairton and was present at the time of his arrest," ECF No. 22, at 6, and cites to *Payton v. New York*, 445 U.S. 573, 603 (1980), in contending that the entry was lawful. The testimony elicited at the evidentiary hearing and the relevant case law lead the Court to conclude that the Task Force lawfully entered the Residence to arrest Mr. Howard.[3] Here's why.

"[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling *in which the suspect lives when there is reason to believe the suspect is within*." *Payton*, 445 U.S. at 603 (emphasis added).[4] "To determine whether the police had probable cause to believe a suspect was residing and present in a home, we apply a common sense approach and consider the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality." *United States v. Veal*, 453 F.3d 164, 167–68 (3d Cir. 2006) (internal quotation marks and citation omitted).[5]

---

[3] The United States did not challenge Mr. Howard's assertion of standing in this case, so the Court need not delve into the potential factual complexities of determining whether the Residence was more analogous to the "multi-unit apartment building" with a locked front door that the Third Circuit discussed in *United States v. Correa*, 653 F.3d 187 (3d Cir. 2011), or a more traditional residence. The Court does note, however, that there are a number of facts in the record which support the argument that Mr. Howard lacked standing to challenge the entry into the Residence in the first instance: the Residence was a single family home divided into multiple units, Hr'g Tr. at 63:16–64:5, and it is arguable that the area in which Task Force members were positioned when they arrested Mr. Howard was a "common area" over which Mr. Howard would have no reasonable expectation of privacy, *see Correa*, 653 F.3d at 188 (upholding denial of motion to suppress firearm and statements to law enforcement officers when the officers entered a multi-unit apartment building with a locked front door through a side window).

[4] The basis for Mr. Howard's argument deals with the italicized portion of the Supreme Court's holding. Mr. Howard does not contend that he was subjected to a warrantless arrest, nor does he challenge the issuance of the arrest warrant for a lack of probable cause. Instead, the Defendant argues only that law enforcement lacked probable cause to believe that he lived in the Residence and was present inside it when they arrived. Based on the credible testimony of the officers who were monitoring the house before they came to get Mr. Howard, that argument is without merit.

[5] In *Veal*, the Third Circuit noted that there is a question as to whether the appropriate standard applied to the inquiry of whether a suspect is in the residence is "probable cause" or "reasonable belief," but that the facts of that case did not require the court to resolve the issue. *Id.* at 167 n.3; *see also United States v. Porter*, 281 F. App'x 106, 109 n.3 (3d Cir. 2008) ("We believe the reference to *Payton* [in *United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005)]

"For purposes of determining whether a suspect resides at a location . . . he need not actually live in the specified residence, so long as he possesses common authority over, or some other significant relationship to, the residence entered by police." *Id.* at 168 n.6 (internal alterations and citation omitted).

In *Veal*, the Third Circuit held that law enforcement officers had probable cause to believe both that the defendant resided in the house and that he was actually inside at the time they arrived. *Id.* at 168–69. As to the former conclusion, the court relied on the following facts: that a parole violation warrant indicated that the defendant no longer lived with his mother but that his wife was a potential lead; a former landlord told law enforcement that the defendant and his wife previously lived together; police were informed that the defendant drove a car which they found outside the house; and the defendant and his wife were married. *Id.* at 168. As to the latter conclusion, police relied on the facts that the car the defendant reportedly drove was parked nearby; officers arrived in the early morning when residents and guests would likely be in the house; police heard "unexplained noises upstairs" while in the living room; and police knew the defendant "was a fugitive who might be attempting to conceal his location." *Id.*

Task Force members testified credibly and consistently at the evidentiary hearing to the following facts, which speak to their reasonable belief that Mr. Howard resided at the Residence: (1) there was a tip from a confidential source that Mr. Howard could be found there, Hr'g Tr. at 21:19–22:15; *see Veal*, 453 F.3d at 168; (2) it was reported that Ms. Arrington was associated with Mr. Howard and Task Force members observed Ms. Arrington going into and out of the Residence, Hr'g Tr. at 29:19–30:11, 54:6–56:11; *cf. Veal*, 453 F.3d at 168 (the fact that defendant and his wife were married supported probable cause to believe defendant lived in his

---

as requiring a showing of probable cause was an error."). Similarly here, the Court concludes that the totality of facts are sufficient under either standard.

wife's house); (3) on one occasion several days before the arrest, a Task Force member surveilling the Residence saw Ms. Arrington pause below a second story window and saw an arm drop something down to her, Hr'g Tr. at 54:6–56:11, which would suggest she did not live in the Residence alone and that whomever lived there with her did not want to be seen by those outside; (4) Task Force members had previously visited other locations where Mr. Howard potentially resided and found that he did not live at any them, *id.* at 20:18–21:9, thus narrowing the list of potential locations where he might be found; and most importantly and likely conclusive on its own, (5) Task Force members identified Mr. Howard when he appeared and shouted down at them from a second story window before they entered the Residence, *id.* at 96:22–23, 96:4–6. The Court concludes that the totality of these facts indicates that probable cause existed for Task Force members to believe that Mr. Howard lived at the Residence.

In support of the Tasks Force members' reasonable belief that Mr. Howard was located at the Residence at the time of the arrest, the following key fact came out at the hearing:[6] Mr. Howard appeared form the second floor window and shouted down to the Task Force members, who were able to positively identify him. *Id.* at 96:22–23, 96:4–6.[7] Again, the Court concludes that the totality of facts presented here demonstrate probable cause to believe that Mr. Howard was present in the Residence at the time of the arrest.

---

[6] The same fact may support both the belief that a defendant resides in a given location and that he is actually inside at the time of arrest. *See Veal*, 453 F.3d at 168 (using the fact that the defendant reportedly drove a car parked nearby the house to support both conclusions).

[7] While that fact alone would be enough, other facts supporting that Mr. Howard was present before the Task Force entered the Residence include: (1) as in *Veal*, the Task Force members heard a great deal of noise after knocking on the front door (despite the fact that no one answered), Hr'g Tr. at 95:21, 97:1–9, *Veal*, 453 F.3d at 168; and (2) the Task Force officers knew that the Defendant "was a fugitive who might be attempting to conceal his location," Hr'g Tr. at 64:23–65:1; *Veal*, 453 F.3d at 168, as Deputy Marshal Delano, the case agent, testified that they had searched "a half dozen" other locations for Mr. Howard from January to September, Hr'g Tr. at 38:25–39:1, and that he passed the information he knew along to the Task Force, *id.* at 23:23–24:4, 34:24–35:2, 42:14–17.

11

Because Task Force members had probable cause to believe both that Mr. Howard lived at the Residence and that he was present when they arrived, their initial entry into the Residence, arrest warrant in hand, was lawful. This conclusion is further bolstered by the Third Circuit's opinion in *United States v. Agnew*, 407 F.3d 193 (3d Cir. 2005). In *Agnew*, our Court of Appeals upheld a district court's denial of a suppression motion when law enforcement officers arrested the defendant inside a house pursuant to an arrest warrant, *id.* at 197. An informant had tipped off a member of a Fugitive Task Force that the defendant "was at the residence at 2740 Ludwig Street and that he was to be in possession of a firearm, a revolver, and that he was also to be in possession of some narcotics." *Id.* at 194–95 (internal quotation marks and alteration omitted). When the officers in *Agnew* knocked and announced themselves as police, they saw the defendant "pull aside a curtain in a window of the home," and then heard "running around" inside. *Id.* Because they had information that the defendant had a handgun, the officers breached the door and arrested the defendant once inside. *Id.*

Mr. Howard's case presents pretty much the same facts, with one slight variance: instead of simply seeing Mr. Howard move the curtains inside the Residence (as in *Agnew*), Task Force members were able to directly identify him because he appeared at the second floor window and shouted down to them. Hr'g Tr. at 96:16–25. The key facts match: a confidential source tipped off Deputy Marshal Delano, a member of the Task Force, that Mr. Howard was at the Residence and that he was also involved with narcotics. *Id.* at 21:19–22:15. Deputy Marshal Delano also knew that the Defendant might have a firearm (an automatic rifle rather than a handgun). *Id.* at 32:17–33:2. Task Force members knocked and announced themselves and subsequently identified Mr. Howard while still outside the Residence. *Id.* at 95:21, 96:4–6, 96:20–22. After

12

identifying themselves, they heard noises from inside, and ultimately decided to breach the front door. *Id.* at 97:1–18. They then arrested Mr. Howard inside the Residence.[8]

In *Agnew*, the Third Circuit held that entry into the house on an arrest warrant was lawful regardless of the alternative framing selected: (1) if the defendant actually resided in the house, law enforcement satisfied the *Payton* inquiry, *Agnew*, 407 F.3d at 196; (2) if the defendant did not reside there, "he may have lacked a privacy interest in the residence and would have no standing to challenge the police officers' entry," *id.*; and (3) even if the defendant had a privacy interest (which Mr. Howard alleges here, as he was as an overnight guest, ECF No. 19, at 6), the Supreme Court's holding in *Steagald*, 451 U.S. at 211–14, that police may not enter a third person's home to serve an arrest warrant on a suspect does not help him because the right described in *Steagald* "is personal to the homeowner and cannot be asserted vicariously by the person named in the arrest warrant," *Agnew*, 407 F.3d at 196–97 (citing *Underwood*, 717 F.2d at 484; *Kaylor*, 877 F.2d at 663 n.5).[9]

Given the Third Circuit's guidance in *Veal* and *Agnew*, the Court concludes that the Task Force members' initial entry into the Residence pursuant to the arrest warrant for Mr. Howard was lawful. *See also United States v. Porter*, 281 F. App'x 106, 108–110 (3d Cir. 2008) (affirming denial of motion to suppress "on the authority of the lawfully obtained arrest warrant" and holding there was probable cause to believe the defendant was present at the time officers arrived when (1) the defendant's father had indicated his son lived somewhere in that neighborhood and (2) a confidential informant provided information that the defendant lived at

---

[8] The Court notes that unlike the defendant in *Agnew*, Mr. Howard complied with Task Force members' commands and did not attempt to flee or resist arrest once the Task Force Members were inside the house. *Id.* at 102:14–104:4; *see Agnew*, 407 F.3d at 195 (stating that officers "apprehended Agnew as he ran up a flight of stairs.").

[9] *See also Steagald* , 451 U.S. at 219 ("The issue here, however, is not whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home, but rather whether the residents of that home can complain of the search.").

13

the address, and also explaining that (3) when a woman opened the door and gestured that the defendant was inside, probable cause was further supported). The Court next turns to whether the protective sweep of the second floor of the Residence was permissible under the Fourth Amendment.

## B. Whether the Protective Sweep of the Second Floor of the Residence was Lawful

Mr. Howard next argues that even if the Task Force's entry into the Residence was lawful, the subsequent protective sweep of the second floor of the Residence (where he was seen in the window) violated the Fourth Amendment once Mr. Howard was arrested and secured. He says that the sweep exceeded constitutional bounds because Task Force members lacked articulable facts which would warrant a belief that a danger remained at the arrest scene. ECF No. 19, at 7–9; *see Maryland v. Buie*, 494 U.S. 325 (1990). The United States contends that the information known to Task Force members at the time was sufficient to believe another individual was in the Residence and that someone (or someones) posed a danger to those on the arrest scene. ECF No. 22, at 9–10. The Court concludes that the totality of the evidence presented at the hearing supports the United States' position that a protective sweep of the second floor was justified in the circumstances. The Court will therefore deny the Motion on those grounds.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327. The purpose of a protective sweep is to "assure [law enforcement officers inside] that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* at 333. The Supreme Court held in

*Buie* that the Fourth Amendment permits protective sweeps in two circumstances: (1) "as an incident to the arrest [officers can], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" ("*Buie* Prong 1"); and (2) in an area not immediately adjoining the place of arrest, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene" ("*Buie* Prong 2"). *Id.* at 334.

In *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997), *abrogated on other grounds as recognized in United States v. White*, 748 F.3d 507, 513 n.6 (3d Cir. 2014), the Third Circuit recognized that a protective sweep under *Buie* Prong 2 may be warranted when "officers had an articulable basis to believe that a confederate of those apprehended was still at large or within the premises and that a weapon previously sighted and not yet recovered might be available within the premises." *Id.* at 824. However, the Court held that the evidence in that case (a § 1983 civil action) negated those possibilities, and that a protective sweep performed after the suspects were apprehended, when officers lacked information that others might be in the house or that a weapon was inside, violated the Fourth Amendment. *Id.* at 825.

In *United States v. White*, the Third Circuit provided the test for protective sweeps when police arrest a defendant outside the residence. 748 F.3d at 514. While the court did not reach the *Buie* Prong 2 analysis, it held that the proper inquiry when an arrest is made outside the home is whether there were articulable facts justifying the protective sweep and remanded on that basis. *Id.* at 513–14. The *White* court also distinguished a prior non-precedential opinion, *United States v. Latz*, 162 F. App'x 113 (3d Cir. 2005), because there the "arrest [of that defendant] unfolded

as he moved across the threshold of the home," whereas in *White*, the defendant was arrested twenty feet from his home rather than "at or across the threshold of his home, [or] in an area that was 'immediately adjacent' to the front door." 748 F.3d at 513. Given the sanctity of the home in the eyes of the Fourth Amendment, *see id.* at 510–11 (collecting cases), our Circuit has determined that where an arrest occurs just outside the home, *Buie* Prong 2 is appropriate.

There does not appear to be a dispute that this case implicates *Buie* Prong 2,[10] meaning that the protective sweep must be justified by "articulable facts" and "rational inferences" that would permit a reasonable belief that an individual was present in the area swept who posed a danger to those on the scene. *Buie*, 494 U.S. at 334; *see* ECF No. 22, at 8 (United States's brief quoting the standard at issue as that set out in *Buie* Prong 2). The Court concludes that the evidence presented at the hearing provided that factual basis.

Unlike the situation in *Sharrar*, where evidence belied the officers' claimed fears for their safety as they sought to justify a protective sweep, the credible testimony of Task Force members at the evidentiary hearing in this case leads the Court to conclude that the protective sweep of the second floor apartment did not violate the Fourth Amendment. First, Task Force members reported hearing a great deal of noise coming from upstairs, and at least one testified that he

---

[10] However, the Court would note that both *Sharrar* and *White* could be read as drawing a line (not a bright line, but a line all the same) between protective sweeps conducted when defendants are arrested inside the house versus outside. Working off of that distinction, it could be argued that if the Court concludes that Mr. Howard's arrest took place inside the Residence, *Buie* Prong 1 would apply and Task Force members would not even need articulable facts justifying their protective sweep since the second floor apartment is arguably "immediately adjacent" to the area of the arrest and an area "from which an attack could be immediately launched," as it is the location from which Mr. Howard exited directly before his arrest. *See White*, 748 F.3d at 511–512 ("[N]o 'articulable basis' is required for a search of an 'immediately adjoining' space authorized by *Buie* prong 1."); *see also United States v. Moten*, __ F. App'x __, No. 13-3801, 2015 WL 2179797, at *7 (3d Cir. May 11, 2015) (upholding denial of suppression when law enforcement officers "took a quick look into the room from which the gunman had emerged moments earlier" and saw evidence in plain view). This would be particularly so given the risk-generative architecture of the wraparound staircase between the second floor and the Task Force team.

thought there were likely multiple people up there from the amount of noise heard.[11] Hr'g Tr. at 95:21, 105:24–106:1, 107:2–5. Second, although the Task Force knew from the noise that people were inside, no one answered the door over the course of thirty to fifty seconds after they knocked and announced themselves. *Id.* at 97:1–9. Third, the Task Force had been briefed that there was a "lot of activity" at the Residence in the days leading up to the arrest, *id.* at 115:8–25, and Detective Lewis had recently seen at least two other individuals (in addition to Mr. Howard and Ms. Arrington) entering and exiting the Residence, *id.* at 66:6–15, 67:6–14. Fourth, the Task Force members knew that the arrest warrant they had for the Defendant was for homicide and that the weapon used in that felony was an assault rifle which had yet to be recovered. *Id.* at 17:4–10, 32:17–33:2, 115:8–25, 153:4–8.[12] Fifth, although not dispositive, neither Mr. Howard nor Ms. Arrington confirmed for the Task Force that no one else was present upstairs in the immediate aftermath of their arrests. *Id.* at 155:13–20. The Court concludes that these facts, taken together, demonstrably constitute "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.

The totality of these facts paints a vivid picture of the dangerous circumstances the Task Force faced. Officers knew of comings and goings to and from the Residence consistent with

---

[11] Mr. Howard offered an explanation for all of the noise—he testified that he was in the shower when the Task Force arrived and that the noises they heard were him running to get dressed. Hr'g Tr. at 205:18–206:19. While that would explain the noise and the reason the Defendant did not swiftly open the door, the actual subjective reason does not matter when the inquiry is based on whether the Task Force, acting on the information available to it at the time, acted reasonably. None of that shower-centric activity was known, or would have been known, to the Task Force team.

[12] They also knew that Mr. Howard had a history of violent offenses. *See* Gov't Ex. 1; Hr'g Tr. at 17:20–25; 19:19–20:1; *id.* at 34:24–35:2. While the Court recognizes the Defendant's argument that some of the offenses listed on the "rap sheet" may have in fact been committed by his father, Task Force members would have been operating on the information provided, and that is the information the Court must assess in determining whether their actions were reasonable.

illegal drug activity. As seconds ticked by with the Task Force waiting in the doorway to execute an arrest warrant for an alleged murderer, they heard substantial noise from the second floor. Add to that the disadvantageous tactical position, an unaccounted-for assault rifle, and the lack of a straight answer from Mr. Howard or Ms. Arrington about whether anyone else was upstairs and the dangerous nature of the event is readily apparent. A reasonable officer could (and almost certainly would) infer that there was an individual or individuals still upstairs who posed a danger to the Task Force.

Mr. Howard attempts to refute the weight and impact of the Government's specific and articulable facts by characterizing this as an absurdist scenario. *See* ECF No. 55, at 2. But in fact, "bogeymen," "madmen," and lawless individuals who refuse to comply with police commands and prepare to harm officers after their companions peacefully surrender is the *very* evil against which *Buie* protects. *See Buie*, 494 U.S. at 333 (describing that Government's interest as ensuring the premises is "not harboring other persons who are dangerous and who could unexpectedly launch an attack. . . . Unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings"). And indeed even when arrestees have told officers that there were no other people in their homes, officers have found some.[13] Hr'g Tr. 106:20–24. Thus, Fourth Amendment allows arresting officers, supported by articulable facts, to protect themselves in the highly tense and dangerous situations Mr. Howard tries to minimize.

---

[13] Mr. Howard's argument that his and Ms. Arrington's peaceful surrender cuts against justifying a protective sweep is of no moment. *See* ECF No. 55, at 5. *Buie* sweeps protect against dangers from other individuals not in custody. The peaceful conduct of the arrestees has modest if any influence on the potential of other dangerous persons who lie in wait.

That the Task Force members were not 100% certain that another person remained upstairs after Mr. Howard and Ms. Arrington surrendered from that location, and that law enforcement ultimately found no one else upstairs does not change the conclusion. What matters is that the Task Force was operating on considerably more than "no information" as an "articulable basis for a sweep." *See Sharrar*, 128 F.3d at 812 (holding standard not met in that case). If officers knew for sure that no one else was present in the house after arresting Mr. Howard and Ms. Arrington, this might be a different case. But they didn't know that for sure, nor could they in this factual context. A protective sweep is conducted specifically for the purpose of confirming whether there is in fact an ongoing threat (and then appropriately responding to it), and falls within the bounds of the Fourth Amendment so long as there are articulable facts justifying a belief that such a threat exists. To hold otherwise in these circumstances would require law enforcement officials to roll the dice with their safety (and the safety of others in the vicinity) when they have an appropriate factual basis for believing they may be at risk.

The Defendant also testified that he was "arrested" not inside the Residence but outside on the front porch, Hr'g Tr. at 206:24–207:1, which at first blush might make his case seem similar to *Sharrar* and *White* and reduce the likelihood that the protective sweep was reasonable. But the Court does not need to resolve whether Mr. Howard or the Task Force members were more credible on that point, as the court in *Sharrar* saw "no reason to impose a bright line rule limiting protective sweeps to in-home arrests," recognizing that sometimes, "an arrest taking place just outside a home may pose an equally serious threat to the arresting officers." 128 F.3d at 824 (internal quotation marks and citation omitted). While the Court is inclined to conclude that Mr. Howard was effectively "arrested" as he was grabbed by the police and "passed back" among members of the Task Force at the bottom of the steps inside the entryway, and before he

was actually handcuffed, Hr'g Tr. at 104:7–20, even if the arrest did not occur until he was cuffed on the front porch, the Court concludes that the Task Force members' concern for their safety was just as real at the threshold of the Residence as it was just inside. *See* Hr'g Tr. at 100:21–102:13, 107:16–108:23, 144:5–14 (testimony regarding tactical disadvantages of the Task Force's position if they chose to retreat rather than perform a protective sweep).

The Court will address one final argument Mr. Howard makes, as it is important to the overall constitutional inquiry. The Defendant contends not only that the Task Force members violated the Fourth Amendment because they lacked articulable facts to justify their protective sweep, but also that they did so as part of a standard operating procedure. ECF Nos. 19, at 4; 30, at 7; 49, at 16. At the evidentiary hearing, Mr. Howard elicited testimony from Task Force members to that effect. *See, e.g.*, Hr'g Tr. at 131:3–22 (Agent Long's testimony), 181:13–15; (Richard Dwyer's testimony). The Court agrees that "[t]he police cannot justify a sweep simply by citing their standard procedure." *United States v. Taylor*, 666 F.3d 406, 409 (6th Cir. 2012); *see also United States v. Williams*, 577 F.3d 878, 881 n.3 (8th Cir. 2009) ("[A] protective sweep may not be conducted as a matter of course."). Protective sweeps are a narrow exception to the stringent requirements of the Fourth Amendment and law enforcement is not authorized to make routine practice of conducting sweeps unsupported by articulable facts.

Here however, the hearing testimony demonstrated that the Task Force members actually performed an individualized assessment of the situation present and actually reasonably believed that the facts as they knew them warranted a protective sweep. Hr'g Tr. at 134:22–135:13, 155:23–156:15, 158:5–10, 160:5–18. They also recognized situations in which they would not perform a protective sweep. *Id.* at 133:25–134:21, 136:4–6. Considered in the context of all of the credible testimony presented, it is apparent that the overriding "standard practice" was to

assess actual safety concerns in a given situation, and to conduct a protective sweep when those concerns counsel its necessity. The facts of this case demonstrate that the Task Force actually had and relied upon an objectively reasonable, factually articulable basis for conducting the protective sweep at issue.

## IV.    CONCLUSION

Because the Task Force's entry into the Residence and protective sweep of the second floor were both lawful, suppression of the drugs seized (and of Mr. Howard's statements at the scene as being the "fruit of the poisonous tree") is not warranted. Mr. Howard's Motion to Suppress Statements and Physical Evidence, ECF No. 19, is DENIED.

Mark R. Hornak
United States District Judge

Dated: November 2, 2015

cc: All counsel of record